IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAVIER CORTINAS,

                Petitioner,

      vs.

TOM L. CAREY, Warden,

                Respondent.

No. 2:06-cv-01390-JKS-CMK

ORDER

Petitioner, a state prisoner proceeding *pro se*, has filed this application for a writ of habeas corpus under 28 U.S.C. § 2254.  The matter was referred to a United States Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On January 22, 2007, the magistrate judge filed findings and recommendations based upon a determination that the petition was untimely and that Petitioner had not made an arguable case for equitable tolling.  The Magistrate Judge's recommendations were served on all parties, which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days.  Petitioner has filed objections to the findings and recommendations.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this Court has conducted a *de novo* review of this case.  Having carefully reviewed the entire file, with particular attention to those portions relevant or pertinent to the objections raised, the Court finds the findings and recommendations to be supported by the record and by proper analysis.

Petitioner argues that he was denied access to the prison law library legal materials necessary for him to draft a habeas petition due to lock down conditions at the prison.  This, he argues, constituted "extraordinary circumstances beyond [his] control that made it impossible to file a petition on time," quoting *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002).  Therefore, Petitioner contends he is entitled to equitable tolling under 28 U.S.C. § 2244(d)(1)(B).

Petitioner relies heavily on the decision in *Whalem/Hunt v. Early*, 233 F.3d 1146 (9th Cir. 2000).  *See also Mendoza v. Cary*, 449 F.3d 1065, 1070–71 (9th Cir. 2006) (holding that lack of Spanish-language legal materials and the assistance of a translator during the AEDPA limitations period may trigger equitable tolling).   In particular, Petitioner refers to the fact that in remanding the matter to the district court to hold an evidentiary hearing the Ninth Circuit stated "determinations of whether there was an 'impediment' under § 2244(d)(1)(B) and whether there are grounds for equitable tolling are highly fact dependent."  233 F.3d at 1148.  The Court agrees that *Whalem/Hunt* provides strong support for Petitioner's argument that on the record as it presently exists it is difficult to definitely state that the requirements of § 2244(d)(1)(B) have not been met.  Ordinarily, this Court, under circumstances such as are present in this case where the question is a close one, might order an evidentiary hearing, but to do so here would not alter the outcome.  Even if the Court were to reach the merits, on the face of the petition and the attached exhibits alone Petitioner would not prevail.  *See* Rules Governing Section 2254 Cases in the United States District Court, Rule 4.  The decision of the Board of Parole Hearings must be upheld if it is supported by some evidence that he is currently a danger to the public.  *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1128–29 (9th Cir. 2006).  The some evidence standard is minimal.  It does not require this Court to examine the entire record, independently assess the credibility of witnesses, or reweigh the evidence.  *Id*., at 1128.

Petitioner attacks the decision of the California Board of Parole Hearings finding him unsuitable for parole and declining to set a parole date.  Petitioner filed a petition for a writ of habeas corpus in the California Superior Court, which granted him relief.  On appeal the California Court of Appeal reversed the decision of the California Superior Court, finding that contrary to the determination of the lower court, "some evidence" supported the decision of the Board.  *In re Cortinas*, 16 Cal.Rptr.3d 271 (Cal.App. 2004), *review dism'd*, 121 P.3d 1237 (Cal. 2005).  Petitioner raises two issues before this Court: (1) he was denied due process by the Board in that its determination was not supported by the evidence; and (2) the California Court of Appeal erred in holding that the failure of the respondent to explicitly deny the allegation of his habeas petition in the California Superior Court that the Board had adopted a "no parole policy," did not amount to an admission the allegation was true.

Because Petitioner filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). Consequently, this Court cannot grant relief unless the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 70-73 (2003) (explaining this standard). In applying this standard, this Court reviews the last reasoned decision by the state court, *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004), which in this case was that of the California Court of Appeal. In addition, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

To the extent that Petitioner raises issues of the proper application of State law, they are beyond the purview of this Court in a federal habeas proceeding. It is presumed that the state court knew and correctly applied state law. *See Walton v. Arizona,* 497 U.S. 639, 653 (1990) *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law). Petitioner's second ground, the effect of the response to the petition, is clearly and unequivocally an issue of state procedural law. The effect of state court pleadings in raising or controverting issues does not present an issue of federal Constitutional magnitude. Accordingly, this Court is precluded from reaching the second ground. Suffice it to say at this point that there is no controlling Supreme Court precedent that requires a respondent to explicitly deny every allegation in a state habeas proceeding. Consequently, it cannot be said that the decision of the California Court of Appeal that the general denial implicitly denied the specific allegation that the Board had adopted a "no parole policy" was contrary to, or an unreasonable application of, clearly established federal law under § 2254(d). *See Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (per curiam).

Petitioner's contention that he was denied due process because the "conclusions reached and factors relied on by the Board were devoid of evidentiary basis," *Biggs v. Terhune,* 334 F.3d 910, 915 (9th Cir. 2003), lacks merit.  The California Court of Appeal extensively reviewed the evidence supporting the decision of the Board (16 Cal.App.3d at 283–290).

Given our analysis and conclusion, we proceed to the Board's primary contention that the court erred in finding that there was no evidence to support the Board's conclusion that defendant was unsuitable for parole.  As outlined above, we resolve this claim by determining whether there was *some* evidence before the Board to support this conclusion.

In pronouncing its decision, the Board listed the following reasons for finding defendant unsuitable: (1) the murder was carried out in an "especially ... cruel manner," demonstrating "exceptionally callous disregard for human suffering" (see Regs., § 2402, subds. (c)(1) [especially cruel] & (c)(1)(D) [exceptionally callous disregard] ); (2) defendant's motive was "trivial" in relation to the offense (see § 2402, subd. (c)(1)(E) ["trivial" or "inexplicable" motive] ); (3) defendant had an unstable social history and criminal history involving substance abuse (see § 2402, subd. (c)(3)); (4) he does not have "acceptable" employment plans; and (5) he currently poses an "unpredictable degree of threat" because (a) his therapeutic progress is "relatively recent," (b) he requires additional therapy "to face, and discuss, and understand the causative factors which led to his life crime," and (c) he needs to demonstrate an ability to maintain his therapeutic gains over a more extended period of time.

The Board's first finding focuses on the circumstances of the offense. Defendant initially claims that in determining whether the circumstances of an offense tend to show unsuitability and justify an extended prison term, the Board must first make a proportionality analysis, comparing the commitment offense against similar offenses, in order to ensure uniformity of punishment for similar offenses.[FN8] We disagree. We conclude that under section 3041, subdivisions (a) and (b), the Board determines a defendant's suitability first, without considering the proportionality of his or her sentence in relation to other prisoners' sentences. Proportionality becomes a consideration only after the suitability determination is made. Once the Board determines that a prisoner is suitable for parole, based on "consideration of the public safety," it "shall set a release date." [FN9] (§ 3041, subd. (b).) At that point, when the Board has found an inmate suitable for parole and is determining an appropriate release date, the Board must consider the proportionality of the prisoner's sentence: "The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." (§ 3041, subd. (a).)

The statute separates the determination of suitability from the determination of a release date, and makes it clear that only the determination of an appropriate release date involves a proportionality analysis.

> FN8. The issue is currently before the California Supreme Court in *In re Dannenberg* (2002) 102 Cal.App.4th 95, 125 Cal.Rptr.2d 458, review granted January 15, 2003, S111029.  [NOTE: a decision has been published:  *In re Dannenberg*, 104 P.3d 783 (Cal. 2005).]
>
> FN9. Section 3041, subdivision (a) provides, in relevant part, that the Board "shall normally set a parole release date" at a prisoner's first parole hearing. It further requires that "[t]he release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, ..." Section 3041, subdivision (b) states, in relevant part, that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

Not surprisingly, we note that in *Rosenkrantz, supra,* 29 Cal.4th at page 638, 128 Cal.Rptr.2d 104, 59 P.3d 174, the court upheld the Governor's determination of unsuitability due to the gravity of the defendant's crime without considering the length of sentence in comparison to the sentences for other similar offenses.

Turning now to the Board's finding of cruelty and callousness, we reiterate our observation in *Smith* that since second degree murder requires express or implied malice, *all* second degree murders by definition involve some degree of cruelty and callousness. (*Smith, supra,* 114 Cal.App.4th at p. 366, 7 Cal.Rptr.3d 655.) Thus, because such a conviction does not automatically render one unsuitable for parole, a determination that a second-degree murder was cruel and/or callous must be supported by some evidence that it was perpetrated in an *especially* cruel manner or with *exceptionally* callous disregard for suffering. (*Id.* at pp. 366-367, 7 Cal.Rptr.3d 655) In *Smith,* the Governor did not cite any facts that reflected exceptionally callous disregard for the victim's suffering. There was no evidence that the defendant acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured his victim before shooting her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. Rather, the defendant, a drug abuser plagued by jealousy, became enraged at his wife because she refused to accompany him and told him she no longer wanted to see him. He grabbed a gun and immediately shot her three times in the head. (*Ibid.*) Although the evidence reflected a callous crime, it did not, in our view, support

ORDER
*Cortinas v. Carey*, 2:06-01390-JKS-CMK                    5

the Governor's finding that defendant acted with callous disregard for the victim's suffering. (*Ibid.*)

Here, the record contains *some* evidence to support the Board's finding. After being summoned outside and challenged by his friend Herena, defendant returned to his house to get a kitchen knife, came back out, and started stabbing Herena. According to the deputy district attorney, he stabbed Herena six times.[FN10] Defendant admitted that he intended to "hurt" Herena. The Board could reasonably conclude that such repeated stabbing caused Herena to suffer a substantial, gratuitous amount of pain, and defendant's expressed intent reflected exceptionally callous disregard for Herena's suffering.

> FN10. Defendant asserts that there is no evidentiary basis for the deputy district attorney's statements. We note, however, that defendant did not dispute these statements or otherwise suggest that they were unfounded. Under the circumstances, the Board could rely on the statements.

Concerning the Board's finding that defendant's motive was trivial, the Board reasonably could have discounted defendant's story that he stabbed Herena because he honestly feared for his life. Indeed, if defendant had truly been afraid, he could have decided to stay inside his house. In this regard, defendant offered no explanation for coming outside when he saw Herena with his hands in his pockets. Furthermore, even if defendant thought Herena had a weapon, there is no evidence that he had one that night. Nevertheless, defendant repeatedly stabbed him, sometimes in the back.

The Board also could have discounted defendant's alleged intoxication. Although defendant said he drank a pint of Southern Comfort around 4:00 p.m. that afternoon, the encounter took place sometime after 11:00 or 11:30 p.m., seven hours later.

The only other possible motivation for the killing was that defendant was angry at Herena for not following his advice, he had had some unspecified problem at home that day, he was frustrated and in a bad mood, and he simply "overreacted" to Herena's challenge.

Given defendant's explanations for the murder, the Board could have considered defendant's view that he *overreacted* to be an accurate understatement and, more specifically, found that (1) his apparent reasons for repeatedly stabbing Herena were insignificant in relation to their fatal result, (2) the link between those reasons and the magnitude of his violence was inexplicable, and (3) Herena's death was not a reasonably foreseeable or predictable reaction to Herena's challenge.[FN11] Under the circumstances, therefore, we disagree with defendant's view that his motivation was no more trivial than that behind any

other second degree murder and conclude that the record supports the Board's finding of triviality.

> FN11. The record contains no evidence that defendant was in a gang or that Herena's challenge to defendant was part of a struggle between rival gangs, evidence that might reasonably raise the possibility of a violent, if not fatal, reaction.

Next, we focus on the finding that defendant had an unstable social history and a criminal history involving substance abuse. Section 2402, subdivision (c)(3), of the Regulations lists "Unstable Social History" as a factor tending to show unsuitability and explains that this means "[t]he prisoner has a history of unstable or tumultuous relationships with others."

In his evaluation, Dr. Glover reported that during defendant's adolescence, he had a "tremendous amount" of conflict with his father, who was very strict and wanted defendant to be a leader, not a follower. However, there is no evidence that defendant had another relationship that could be called "unstable" or "tumultuous." Thus, although defendant had one such relationship, that one does not reasonably constitute *some* evidence of "a *history* of unstable or tumultuous *relationships* with others." (Regs., § 2402, subd. (c)(3), italics added.)

Section 2402, subdivision (c)(2) of the Regulations makes a defendant's criminal history a factor showing unsuitability insofar as it reveals that "on previous occasions [he or she] inflicted or attempted to inflict serious injury on a victim, particularly if [he or she] demonstrated serious assaultive behavior at an early age." [FN12] Thus, although the record supports the Board's finding that defendant had prior criminal record involving substance abuse-i.e., convictions as a teenager for unlawful possession of alcohol and driving under the influence, and use of marijuana and cocaine-this finding does not correlate with the enumerated factors showing unsuitability.[FN13]

> FN12. Conversely, section 2402, subdivision (d)(1) and (6) of the Regulations make the lack of a juvenile or adult criminal history involving assaultive or violent conduct or crimes a factor tending to show suitability.
>
> FN13. The People suggest that defendant's criminal record and history of substance abuse support a finding that he had an unstable social history. However, in the absence of evidence that prior nonviolent, nonassaultive conduct and crimes involving substance abuse were accompanied by, involved, or caused difficulty with other people or conflict in social situations, we fail to see how substance abuse, standing alone, reflects an unstable *social* history. However, we do not intend to suggest that defendant's convictions and history of alcohol and drug abuse were irrelevant in determining his suitability for parole. On the contrary, such

> evidence can be relevant in understanding the underlying causes of a commitment offense, the reasons for therapy, and subsequent psychiatric evaluations.

---

Next, we look to see if there is some support for the Board's conclusion that defendant does not have "acceptable employment plans." This finding implicitly relates to section 2402, subdivision (d)(8) of the Regulations, which lists as a factor showing suitability "Understanding and Plans for Future," and provides, "The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." Comments by Board members shed some light on the meaning of the Board's finding. Commissioner Pliler observed that defendant "has, you know, employable skills in several different areas when he is released. And he has a high school diploma.... So you've done basically what's been asked of you at prior hearings. So it would appear that you would not have difficulty in maintaining some type of employment when you're released." However, Commissioner Lawin asked what defendant was going to do for work. As noted, defendant responded generally that finding work would not be a problem, even if he had to "flip burgers." Commissioner Lawin continued, "It's nice that you're that confident in your abilities, but we need to see that you're out looking for something. You can't rely on your parents or your aunt or uncle or anyone else to find a job for you. Have you sent out any letters or resumes or do you have any sort of listings of people that might-" Defendant said he had only looked in newspapers. The member said that "what we would like to see is that you're looking for work, that you're trying to find someone who at least says yes, you're qualified. When you get out, come see me and I'll interview you. Or, you know, yes, you're qualified. If we have a spot open I'd be happy to talk to you about it. If you can get anything that shows us that you're actively looking for someone to hire you it would be very helpful because what we have to see is that you're going to be able to support yourself. We can't let you out with no financial support. You have skills. You've acquired skills in here. Use those skills to try and find something. You know, even if you just send out letters and you don't get any responses, keep a list of those places you've sent the letter or resumes to and show us." The member further suggested that if defendant's family intended to help him make contacts for work and provide financial support and transportation, then they needed to put that commitment in writing and submit it to the Board along with their general letters of support.

Given these comments, we understand the Board's finding to mean that in addition to developing marketable skills, the Board wanted to see some evidence that he knew how to prepare a resume and write letters to prospective employers or had shown some initiative in seeking help to do so and then taken practical and realistic steps toward soliciting potential employers about a job, potential

openings, or his qualifications.[FN14] The Board also wanted some more specific and explicit assurance from defendant's family members that they were going to assume responsibility for helping defendant find employment and provide the necessary practical and financial support during his transition to a productive life outside of prison.

> FN14. Apparently, the Board did not accept defense counsel's effort to take "a little bit" of the blame for defendant's failure to send resumes or letters as an indication that defendant had shown some initiative in looking for a job other than to look in the newspaper.

With this understanding of the Board's finding in mind, we cannot say there is no evidence to support it. Rather, there is some evidence that defendant had not done anything more than look in the newspaper listings for job opportunities. He had not sent out resumes or otherwise reached out to prospective employers. (Compare with *Smith, supra,* 114 Cal.App.4th at p. 355, 7 Cal.Rptr.3d 655 [defendant presented written evidence of two job offers].) Moreover, in their letters of support, defendant's family members and friends simply offered generally to help with employment and housing. [FN15]

> FN15. Although defendant's aunt and uncle offered him a job at their ranch in Texas, they had not as yet acquired it.

We now review the Board's conclusion that because defendant's therapeutic progress is "relatively recent," he needs additional therapy "to face, and discuss, and understand the causative factors which led to his life of crime," and therefore, until further progress is made and he demonstrates "an ability to maintain gains over an extended period of time," he "continues to be unpredictable and a threat to others" if released at this time.

As noted, a 1989 evaluation noted that defendant had a prior history of "polysubstance abuse" and concluded that because defendant was motivated to explore and learn the "psychogenisis" of his crime, he would probably become conversant with the "subconscious" forces that caused it. Thereafter, defendant was written up for misconduct in 1990, 1991, and 1992. The 1994 psychiatric evaluation noted that defendant had remained discipline free since 1992. It also noted defendant's history of alcohol and "polydrug" abuse and stated that he had been active in AA and appeared to have profited from therapy when he was first incarcerated. However, the report concluded that defendant needed more education and understanding of his alcoholism, recovery and the AA process.

In 1997, he received a discipline write-up but thereafter remained discipline free. In the May 2000 evaluation, Dr. Glover noted that defendant believed his depression as a teenager and young adult was caused by his strict

father. However, Dr. Glover disagreed, stating a few times that defendant's
history of depression was more likely the result of his use of marijuana and
cocaine, which can produce the sort of depressive and paranoid symptoms and
ideations that contributed to his offense. Nevertheless, Dr. Glover opined that
defendant "has gained a fair amount of insight into his development and
subsequent crime."

Next, we observe that in explaining the murder to the Board, defendant
focused on what he considered to be the immediate causal circumstances: his
general fear of Herena's friend, his drinking in general and earlier that day, his
frustration, his bad mood, and his belief that Herena might be armed and want to
kill him. As noted, defendant believed he overreacted to Herena's challenge.
Other than admitting he had been in denial "that alcohol created all this to
happen," defendant revealed no understanding of his drug abuse or awareness of
how it may also have affected his mental and emotional states and contributed to
his crime. He did not discuss how or why he started using drugs other than to
suggest that it was youthful experimentation; nor did he demonstrate an
awareness of a possible connection between his chronic use of drugs and his
experience of depression and paranoia, both of which, according to Dr. Glover,
manifested themselves on the day of the killing. On the contrary, defendant
showed no recognition that drug use might have magnified his fear of Herena
before and at the time of the incident and distorted his perception of danger.
Indeed, at the parole hearing, defendant did not discuss his depression or paranoia
and tended to minimize the extent of his drug use. [FN16] The Board could have
reasonably found this particularly troubling in light of counsel's closing
statements concerning what could happen if defendant started drinking or taking
drugs again. Despite Dr. Glover's strong opinion about the connection between
defendant's drug use and the murder, defendant focused only on his problem with
alcohol. Moreover, he explained that "since my last hearing they really nailed me
on that and I really got interested in going to these programs and really paying
attention and understanding the whole meaning of all these steps."

> FN16. At the hearing, when asked about drug use, defendant said only
> that as a teenager, he "experienced [ *sic*] marijuana and some cocaine."
> Later, the Board noted Dr. Glover's evaluation, reporting that defendant
> had admitted that he had used marijuana extensively, smoking numerous
> times per week, and had snorted cocaine two times a month or whenever
> it was available. Given Dr. Glover's report, one Board member observed,
> "I got the impression from your comments a while ago that you just did
> this very sporadically, but according to what you told Dr. Glover, you
> were a pretty regular user of drugs." In response, defendant said, "Well,
> of cocaine, like I said, I've tried it, I experimented. I wasn't an addict or
> nothing. It [was] just teenage years that I just tried it. But marijuana, I
> did use that, but that's the last thing on my mind. I doubt very seriously I
> will ever even touch drugs again. I'm more here focusing on the alcohol

> right now. And drugs is not even an issue for me no more. That's over
> with."

Last, we note that although Dr. Glover opined that defendant had a low
potential for violence in prison and that he expected it to remain low if and when
defendant was released, Hawkins opined that the degree of threat defendant
presented to the community remained "unpredictable."

In our view, the evidence that defendant had been discipline free only
since his last hearing, his admission that only after his last parole hearing did he
"really" get interested in and pay attention to the AA step process, his failure to
articulate any awareness or understanding of his drug use as a contributing factor,
and Hawkins's opinion concerning the unpredictable threat defendant would pose
if released together constitute *some* evidence reasonably supporting the Board's
view that defendant's full comprehension of the step process has been recent; he
needs additional therapy to recognize, understand, and learn how to better
articulate his awareness concerning all the underlying causes of his offense,
including his depression, paranoia, and chronic use of drugs as a teenager; and it
is appropriate for him to show that he has integrated his therapeutic understanding
for an additional period of time.

Defendant notes—and the trial court emphasized—that the record contains
abundant evidence that is not only inconsistent with this finding but strongly
indicative of his suitability for parole. For example, defendant argues that
Hawkins's use of the word "unpredictable" to rate defendant's level of
dangerousness is "meaningless"; the court below found that it is a "conclusory
term used by a correctional counselor when he or she does not know enough
about a prisoner to offer any insight or prediction." On the other hand, defendant
and the court noted Dr. Glover's professional opinion that defendant's potential
for violence was low.

In our view, however, this approach to Hawkins's and Dr. Glover's
evaluations is inconsistent with the standard and scope of review of the Board's
decision. As noted, the factual basis for the Board's decision "is subject to a
*limited* judicial review under the 'some evidence' standard of review."
(*Rosenkrantz, supra,* 29 Cal.4th at p. 652, 128 Cal.Rptr.2d 104, 59 P.3d 174,
italics added.) Specifically, when reviewing a decision to deny parole, we merely
inquire "whether some evidence in the record before the Board supports the
decision to deny parole, based upon the factors specified by statute and
regulation." (*Id.* at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Only a "modicum
of evidence" is required, and, in determining whether the record contains such
evidence, we may not independently resolve conflicts in the evidence, determine
the weight to be given the evidence, or decide the manner in which the specified
factors relevant to parole suitability are considered and balanced. Rather these are

matters exclusively within the discretion of the Board or the Governor. Indeed, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

Here, faced with reports by Hawkins and Dr. Glover, the Board apparently accepted Hawkins's view and agreed with it. Both defendant and the court, however, substitute their own assessments of the weight that should have been given these reports.

Defendant argues that the court properly deemed Hawkins's view meaningless in light of undisputed evidence submitted in support of his writ petition to the effect that Hawkins did not know defendant well enough to make an assessment of dangerousness.[FN17] First, we observe that at his parole hearing, defendant never challenged Hawkins's evaluation or assessment of dangerousness, even after the Board cited and relied on it. Second, defendant's opinion expressed in his declaration, whether undisputed or not, is insufficient by itself to discredit Hawkins's evaluation, which, the record reveals, was the result of "a personal interview, and incidental contact with [defendant], consisting of approximately 1.5 hours and a thorough review of his central file, consisting of 3.5 hours." Last, in the absence of evidence that Hawkins was professionally unqualified to evaluate defendant, we question whether it is appropriate in a habeas proceeding for the court to make factual determinations concerning the credibility evaluations made by Board members in the course of their duties or the reasonableness of the Board's reliance on a particular evaluation.

> FN17. In a declaration submitted with his petition, defendant asserted, that Hawkins rated his dangerousness level "unpredictable based on the fact that he does not know me on a better level to rate me."

As our analysis and discussion reveal, we find some evidence to support all of the Board's findings of unsuitability except the findings concerning defendant's social and criminal history. Nevertheless, we do not find the Board's reliance on these factors to be so essential or significant to its decision that without them, the Board would have found defendant suitable for parole. On the contrary, a fair reading of the Board's decision reveals that it placed primary emphasis and weight on the circumstances of the offense, defendant's lack of more concrete employment plans, and his need to demonstrate greater understanding of the causes of his offense over an additional period of time. Under the circumstances, therefore, it is sufficiently clear to us that the Board would have reached the same conclusion even without referring to defendant's social and criminal history. Moreover, "those portions of the decision that are supported by some evidence constitute a sufficient basis supporting the [Board's]

discretionary decision to deny parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

In sum, given the number of factors showing unsuitability and the evidence supporting them, we conclude that the Board did not abuse its discretion by denying defendant parole at the 2000 hearing, because there was " 'some evidence' " (*Rosenkrantz, supra,* 29 Cal.4th at p. 652, 128 Cal.Rptr.2d 104, 59 P.3d 174) to support its conclusion that he would "pose an unreasonable risk of danger to society if released from prison." (Regs., § 2402, subd. (a).) Therefore, we hold that the trial court erred in reversing the Board and ordering it to schedule a parole release date.

The factors relied upon by the California Court of Appeal unquestionably constitute "'some evidence' having 'some indicia of reliability.' " *McQuillion v. Duncan,* 306 F.3d 895, 904 (9th Cir. 2002) (applying standard outlined by the Supreme Court in *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)); *see Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007); *Sass v. California Board of Prison Terms, supra.*  In light of *Hill*, *Irons*, *Sass,* and *McQuillion*, this Court cannot say that the decision of the California Court of Appeal, which applied the same "some evidence" test applied in *Hill*, was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Nor can this Court find that the California Court of Appeal unreasonably applied the correct legal principle to the facts of the Petitioner's case as required by *Lockyer–Williams*; *i.e*., the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Thus, the Board did not deny Petitioner due process and he is not entitled to relief on the first ground.

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed January 7, 2007, are adopted in full; and

2. Petitioner's application for a writ of habeas corpus is DISMISSED; and

3. This case is closed.

Dated:  December 17, 2007

s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge